Receipt # 202242

ORIGINAL

ECF

FILED
APR 9 2004
U.S. COURT OF FEDERAL CLAIMS

UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| **METRICA, INC.**<br>**8620 N. New Braunfels**<br>**San Antonio, TX 78217**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**THE UNITED STATES OF AMERICA**<br><br>**Defendant.** | **Case No.** 04-636C |

## COMPLAINT

Plaintiff Metrica, Inc. complains as follows regarding defendant The United States of America:

### Jurisdiction

1. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1491 and 41 U.S.C. § 609. This case arises from a final decision of a contracting officer on a government claim.

### Parties

2. Plaintiff Metrica, Inc. ("Metrica") is a Texas corporation with its principal place of business in San Antonio, TX.

4. Defendant The United States of America (hereinafter the "Government") is sued here as a result of actions performed on its behalf by its agency, the Department of the Army, the Secretary of the Army, together with his officers, agents, employees, and representatives.

**Facts**

5. On or about March 21, 2003, the Government issued a solicitation seeking services necessary to deploy a software system known as Release 3.X of the Defense Medical Logistics Standard System ("DMLSS").

6. Metrica submitted a timely proposal and, upon information and belief, so did a company known as ACS Government Services, Inc., which has recently been purchased by and is now a subsidiary of Lockheed-Martin Corporation (hereinafter "ACS").

7. Metrica's final offered total cost was $3,960,657.67, whereas ACS offered a total cost of $4,819,385.20. The Army, nevertheless, determined to award to ACS, which it said submitted a superior technical proposal. ACS' proposal, however, was not technically superior to Metrica's proposal, in addition to being more costly. ACS' past performance was not as strong as Metrica's, and ACS' proposed staffing was far less qualified than Metrica's. Moreover, ACS' technical approach did not show the substantial knowledge of the processes at issue that Metrica demonstrated in its proposals. Metrica was the incumbent and clearly had stronger past performance, staff, and technical knowledge when compared to ACS. Upon information and belief, the award to ACS was driven by Denise Johnson, a government employee who managed the DMLSS project, and who had and has a close personal and business relationship to ACS.

8. Metrica protested to the General Accounting Office concerning the award to ACS. The Government, despite the protest, permitted ACS to work on the DMLSS project under the guise of am illegal bridge contract. Upon information and belief, the Government adopted this position at Johnson's behest.

9. After many weeks of protest litigation, however, the Government conceded that its

award to ACS was improper and violated regulation and statute. The Government, therefore, agreed to re-compete the DMLSS procurement.

10. Upon the recompetition, the Government awarded a contract to Metrica. ACS thereafter protested the award to the General Accounting Office.

11. Upon ACS' protest of the award, the Government suspended Metrica's contract. Upon information and belief, Johnson engineered the suspension of Metrica's contract.

12. Johnson, upon information and belief, also attempted to prevent personnel from working for Metrica on the DMLSS effort. Specifically, upon information and belief, Johnson attempted to persuade personnel and their then current employers to take actions designed to assure that Metrica would not succeed in its DMLSS work. She had conversations and sent emails concerning this matter to the affected companies and/or personnel and others, and indeed, upon information and belief, was instrumental in having ACS, the incumbent which had lost the contract award, move several persons, including Messrs. Jerry Bryant and Ernesto Beckford, to positions on other ACS contracts where they were unneeded and merely parked to allow their salaries to be covered by the Government, so as to assure their unavailability to Metrica. In fact, upon information and belief, some of these ACS contracts had been extended improperly at Johnson's request. In addition, upon information and belief, Johnson communicated with personnel at a company known as MSGI to remind that company that it could not provide another person, Mr. Pedro Gomez, to Metrica because he had been assigned exclusively to a subcontract with ACS for which she was the Contracting Officer's Technical Representative. Upon further information and belief, Johnson then attempted to assign and/or assigned certain of Metrica's DMLSS work to ACS under the Help Desk contract, even though that contract's

statement of work does not include Metrica's work.

13. Johnson's actions were well known in the DMLSS community. One company advised Metrica after award that it would not place any individuals on a Metrica DMLSS contract because that company believed that the contract was high-risk due to Johnson and the actions expected of her. Another company advised Metrica that it refused Johnson's requests not to assist Metrica, and that Johnson immediately thereafter began to take actions designed to harm that company's ability to do business with the Government, including taking that company's tasks under another contract and assigning them to ACS under the ACS Help Desk contract.

14. ACS' protest to GAO concerning the award of the contract contended that Metrica improperly proposed three personnel employed by ACS who had not agreed to work for Metrica, had not given their consent to be proposed by Metrica, and instead had exclusively committed themselves to ACS. ACS claimed that Metrica's proposal of these three persons, along with Metrica's proposal of another eight personnel, constituted a misrepresentation by Metrica on which the Government relied in awarding the contract to Metrica.

15. The Government's instructions in its recompeted DMLSS solicitation stated at § L.2.1.2 as follows in pertinent part:

> [The offeror shall] [i]dentify personnel proposed for assignment to the project, certify that the information on each person is accurate and complete, and that the individuals named are available for assignment on the date the award is effective. As a minimum, the person designated to manage the project must be identified.

16. ACS required each of its and its subcontractor's employees sign a statement that they "authorized ACS exclusive rights to submit [that person's] resume as part of a proposal submitted in response to the [DMLSS Deployment Release 3.x] solicitation."

17. Metrica did indeed propose three ACS employees as part of its proposal for the DMLSS recompetition contract. Metrica, however, used a rational, wholly appropriate process to determine to propose these persons for the DMLSS procurement.

18. In determining who to propose, Metrica first read the Solicitation's instructions. As noted, these instructions at § L.2.1.2 stated in pertinent part only the following:

> Identify personnel proposed for assignment to the project, certify that the information on each person is accurate and complete, and that the individuals named are available for assignment on the date the award is effective. As a minimum, the person designated to manage the project must be identified.

19. The Government's Solicitation's instructions did not require that Metrica certify or have specific permission to (a) use a person's resume, or (b) propose the person. It required only that Metrica certify (a) to the accuracy of the resumes offered and (b) that the persons proposed would be available to be used on this contract on the effective date of award.

20. Based on the Government's solicitation's instructions, Metrica delineated in its proposal the following staffing approach:

> The approach to staffing the project is to maintain the existing teams that are currently involved in the DMLSS 3.X deployment process, if possible. When not possible, the Metrica team's staff represented in the resumes in section 4.2 will assume the respective position(s). The two deployment teams will consist of five personnel each. In addition, Metrica will have a full-time Project Manager dedicated to this project, and a part-time Administrative Specialist. The resumes for all twelve people are contained in section 4.2. Metrica does not expect any government augmentation of these teams.

21. Metrica provided eleven "resumes in section 4.2," including the resumes of three persons who were ACS employees at the time of proposal submission.

22. Metrica used a three step process in determining to propose the three ACS employees among others, in section 4.2, and concluded that these persons could be proposed, but others could

not, because, with respect to these persons, Metrica could appropriately certify (a) to the accuracy of the resumes offered and (b) that the persons proposed would be available to be used on this contract on the effective date of award, as required by the Government's solicitation.

23. First, Metrica started by identifying the eleven incumbent personnel, given that Metrica was the prior incumbent and knew the incumbent employees. Seven of the eleven incumbents were people that Metrica had used on the contract for many months and four others were persons which Metrica knew at least their names. Metrica worked on the second floor of the same building as ACS' DMLSS personnel, who worked on the third floor of that building. Consequently, Metrica attempted to contact these eleven persons in the hallway and elsewhere in the area in and around the building, or by telephone if necessary, in order to determine if they would be available to Metrica for assignment on the date the award is effective.

24. Second, Metrica determined that it could not submit all eleven incumbents because of the requirements of § L.2.1.2, which mandated that Metrica had to certify to two things – that the resume was accurate and that the individual would be available for assignment on the effective date of the contract. Metrica had only seven of the eleven resumes of the incumbents. The company tried to contact the four persons the resumes of whom Metrica did not have in its possession. One of the persons could not be reached at all, and three said that they would not give Metrica their resumes. Of the other seven remaining persons for which Metrica had resumes, Metrica determined that it could not propose four of the seven because the company could not get the information that these persons would work for Metrica if it were awarded the contract, as required by the Government's solicitation.

25. Third, with respect to the three persons who remained – each of which was a current ACS employee – Metrica provided a resume for each and certified to the following:

> . . . that this resume is accurate and that (NAME OF PERSON) has agreed to work on this contract if awarded to Metrica, Inc.

26. Metrica proposed the three ACS employees because the company had their resumes which the company knew to be accurate, and the company reasonably believed that these persons would work for Metrica if it were awarded the contract. Specifically, Metrica believed that the three ACS employees would come to work for Metrica if the company were awarded the contract based on the communications the company had with each of these persons.

27. The three ACS employees were well known to Metrica and its personnel. One had worked for Metrica for a year or two prior to his going to work for ACS. He knew one of Metrica's key personnel on the DMLSS project from the military, having served with him in Saudi Arabia. A second had worked for Metrica in 2002 and 2003. The third had worked for Metrica's subcontractor on the DMLSS project for over a year prior to accepting a job with ACS when it won the contract from Metrica which resulted in the Metrica protest described above.

28. The third ACS employee, before and during the current DMLSS competition, had spoken with Metrica personnel stating that he wanted to work for Metrica on a Metrica computer hardware contract related to DMLSS. Metrica managers understood that he wanted to leave ACS and come to work for Metrica if Metrica was awarded the DMLSS contract. Immediately upon award of the DMLSS contract to Metrica, the third ACS employee immediately quit ACS and came to work for Metrica on the DMLSS contract.

29. The second ACS employee indicated to Metrica that if Metrica were awarded the

contract, he wanted to keep his DMLSS job. He related this information to Metrica in a conversation with a Metrica employee prior to Metrica's submission of its DMLSS proposal. He told the Metrica employee in the conversation that he had an agreement that ACS had him sign which prevented him from giving Metrica his resume. The employee, however, also stated explicitly that if Metrica wins, he hoped he still had his DMLSS job. The Metrica employee with whom the ACS employee spoke and who knew the employee from his days in the military, understood the employee's statement as an affirmative response to the specific question of whether he would come to work for Metrica if it won the contract award.

30. Within a day or so after speaking with the second ACS employee, the same Metrica employee also spoke with the first ACS employee. Metrica did not ask the first employee for his resume because it already knew from the second employee about the exclusive resume agreement with ACS. Instead, the Metrica employee simply asked the ACS employee if he would work for Metrica if Metrica won the competition, and that ACS employee responded affirmatively and expressly that he would do so.

31. None of the three ACS employees ever told anyone at Metrica that the company could not submit their names or resumes with Metrica's proposal. This question was not asked of them as it was not relevant under the terms of the solicitation.

32. ACS identified in its proposal all the employees and subcontractor employees then performing the DMLSS contract. ACS' proposal contained the following signed statement from its employees:

> I have authorized ACS exclusive rights to submit my resume as part of a proposal submitted in response to the [DMLSS Deployment Release 3.x] solicitation.

33. ACS did not provide the certifications required by § L.1.2.1 of the RFP.

34. The Government, which had both ACS' and Metrica's certifications, did not indicate to Metrica any belief that there was any inconsistency between ACS' assertion that it had exclusive rights to submit a resume, and Metrica's assertions that the three ACS employees would come to work for Metrica if the Government awarded the contract to the company. Indeed, there is no inconsistency because the Government's solicitation did not require that Metrica have the proposed employee's agreement to submit his or her name or submit his or her resume.

35. On or about January 20, 2004, the General Accounting Office sustained ACS' protest finding that Metrica had not used due diligence to assure the accuracy of its certifications because Metrica had the obligation to obtain the express permission to use the names and resumes of all personnel in Metrica's proposal, and three ACS employees proposed by Metrica were not sufficiently committed to Metrica as they had not discussed the specifics of salary, benefits and the precise jobs involved. GAO recommended that the Government terminate Metrica's DMLSS contract and award the contract to ACS and not permit Metrica even to seek the contract. GAO reached this decision despite concluding that "Metrica may have believed that the employees in question would be available to work for Metrica." GAO did not find that anything Metrica or the Government did violated statute or regulation. GAO's decision was inconsistent with its past precedent and irrational. It failed to acknowledge undisputed evidence; invoked a policy that was not implicated by the facts of this case; required Metrica to take actions which were not required by the Government's solicitation; and allowed a private contractor, ACS, to dictate whether its employees could be proposed by a competitor who believed that the personnel would work for the competitor

if it won the contract award.

36. On or about March 4, 2004, the Government contracting officer issued a contract modification in the form of a contracting officer's final decision on a Government claim which canceled the award to Metrica, thus terminating Metrica's contract, and further determined that the Government was awarding the contract to ACS and would require reimbursement from Metrica of ACS' costs of filing and pursuing the protest, including attorneys fees. Since then, the Government has withheld $67,089.27 in payments from Metrica for work Metrica performed for the Government. The Government contends that it was and is acting pursuant to its authority in FAR 52.212-4, that the contract modification constitutes a final decision of the Contracting Officer, and that Metrica had the right to appeal under the Contract's disputes clause, which the Contracting Officer identified as FAR 33.211.

37. Upon information and belief, the Government's Contracting Officer did not consider the *bona fides* of GAO's recommendation when determining to terminate Metrica's contract. Rather, the Contracting Officer followed the recommendation despite the problems with it described in paragraph 35 above. Upon information and belief, the Government decided to follow GAO's recommendation on the basis of Johnson's actions and advice, which were permeated by her bad faith against Metrica and her favoritism for ACS.

**Count I**

38. Metrica incorporates paragraphs 1 - 37 above.

39. Metrica made no misrepresentations, not fraudulently and not negligently.

40. The Government's termination of Metrica's contract and award of that contract to ACS

was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; and without observance of procedure required by law.

41. The Government's termination of Metrica's contract constitutes a breach of contract.

42. The Government's withholding of payments due to Metrica constitute a breach of contract.

43. The Government's improper actions and contract breaches have damaged and continue to damage Metrica in an amount to be proven at trial, but no less than $250,000.

**Count II**

44. Metrica incorporates paragraphs 1 - 43 above.

45. GAO's decision was (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; and (D) without observance of procedure required by law.

**Count III**

46. Metrica incorporates paragraphs 1 - 45 above.

47. The Government's decision to terminate Metrica's contract and deny Metrica the opportunity to compete for and/or receive and/or perform under the DMLSS contract and to instead award that contract to ACS was made in bad faith and in furtherance of the Government's inappropriate efforts to assist ACS and preclude Metrica from performing under its DMLSS contract.

48. The Government's actions violate FAR 3.101.

WHEREFORE, Metrica prays for judgment against defendant the Government as follows:

1. A declaration that the Government's termination of Metrica's contract was and is wrongful and that the contract should be reinstated;

2. Damages to compensate Metrica for the Government's improper contract termination and related conduct, and breach of contract;

3. An injunction requiring the Government to reinstate Metrica's contract;

4. An injunction precluding the Government from deducting any amounts otherwise due to Metrica and reinstating payments owing to Metrica, related to any Government decision to compensate or otherwise pay any amounts to ACS for costs or fees, or for any DMLSS work performed by ACS with respect to Release 3.X of the Defense Medical Logistics Standard System;

5. The costs of this action, including reasonable attorneys fees; and

6. Such other and further relief as the Court may deem just and proper.

Respectfully submitted,

Edward J. Tolchin
Fettmann, Tolchin & Majors, P.C.
10509 Judicial Drive, Suite 300
Fairfax, Virginia 22030
(703) 385-9500
(703) 385-9893 (Fax)
etolchin@ftm-pc.com
Counsel for Metrica, Inc.